**In the Matter of HYGRADE ENVELOPE CORP., Bankrupt.**

**Samuel S. BARANOW, Trustee in Bankruptcy of Hygrade Envelope Corp., Appellant,**

**v.**

**GIBRALTAR FACTORS CORP., Respondent.**

**No. 267, Docket 31766.**

United States Court of Appeals Second Circuit.

Argued Feb. 19, 1968.

Decided April 1, 1968.

Abraham L. Popper, New York City (Popper & Popper, William I. Popper, New York City, on brief), for appellant.

Louis P. Rosenberg, Brooklyn, N. Y. (Sydney Krause, New York City, on brief), for respondent.

Before FRIENDLY and SMITH, Circuit Judges, and GIGNOUX, District Judge.*

FRIENDLY, Circuit Judge:

Hygrade Envelope Corp. was adjudicated a bankrupt in the District Court for the Eastern District of New York on a voluntary petition filed on January 24, 1963. On November 26, 1962, it had transferred to Gibraltar Factors Corp. a term insurance policy in the face amount of $100,000 on the life of its vice president and general manager, Jack Wohl.[1] A referee in bankruptcy and the district court initially rejected a counterclaim by the trustee under § 60b to recover as a preference the proceeds of the policy, $101,000, collected by Gibraltar as a result of Wohl's sudden death on December 5, 1962, on the ground that Gibraltar did not have "reasonable cause to believe" Hygrade was insolvent on November 26. On a pre-

---

* Of the District Court of Maine, sitting by designation.

1. Apparently the policy had cost $1000 but its cash surrender value had declined to $393 due to the lapse of time.

vious appeal we disagreed and remanded the cause "so that the referee may make further findings and conclusions on the issues, reserved by him, whether the transfer was for or on account of an antecedent debt, § 60a(1), and whether, if the transfer was preferential, Gibraltar is entitled to a set off under § 60c," as well as the claim, first advanced on Gibraltar's petition for rehearing in this court, "that the trustee is not entitled to recover because the insurance policy was exempt property under New York Insurance Law § 166(1) * * *." 366 F.2d 584, 589–590 (2 Cir. 1966).

The case returns to us with reaffirmance of the dismissal of the trustee's counterclaim by the same referee and a different district judge but with sharp disagreement between them as to the reason. The referee sustained the argument that the proceeds of the policy were within the exemption conferred by § 6 of the Bankruptcy Act; he thought, however, that apart from this "the trustee has proved all of the elements required for a preference to be voided

under the provision of Section 60 of the Bankruptcy Act and that consequently the trustee would be entitled to judgment on his counterclaim," free of any set-off by Gibraltar for advances subsequent to November 26, 1962. The district judge concluded that the policy was not exempt but held that the transfer was not "for or on account of an antecedent debt," and that in any event the transfer was only in the amount of $393, the sum Hygrade would have realized on surrender of the policy, or at most $1000, the cost of a new one-year policy, and should be disregarded as *de minimis*. We hold the trustee is entitled to recover on his counterclaim reduced, however, by certain amounts as explained below.

### I.

■ Gibraltar's contention with respect to exemption rests on the third sentence of § 166, subd. 1 of the New York Insurance Law, McKinney's Consol. Laws, c. 28, which we quote in the margin.[2] Judge Weinstein ruled that

2. "§ 166. *Exemption of proceeds and avails of certain insurance and annuity contracts.*

1. If any policy of insurance has been or shall be effected by any person on his own life in favor of a third person beneficiary, or made payable, by assignment, change of beneficiary or otherwise, to a third person, such third person beneficiary, assignee or payee shall be entitled to the proceeds and avails of such policy as against the creditors, personal representatives, trustees in bankruptcy and receivers in state and federal courts of the person effecting the insurance. If any policy of insurance has been or shall be effected by any person upon the life of another person in favor of the person effecting the same or made payable, by assignment, change of beneficiary or otherwise, to such person, the latter shall be entitled to the proceeds and avails of such policy as against the creditors, personal representatives, trustees in bankruptcy and receivers in state and federal courts of the person insured; if the person effecting such insurance shall be the wife of the insured, she shall be entitled to the proceeds and avails of such policy as

against her own creditors, trustees in bankruptcy and receivers in state and federal courts. *If any policy of insurance has been or shall be effected by any person on the life of another person in favor of a third person beneficiary, or made payable, by assignment, change of beneficiary or otherwise, to a third person, such third person beneficiary, assignee or payee shall be entitled to the proceeds and avails of such policy as against the creditors, personal representatives, trustees in bankruptcy and receivers in state and federal courts of the person insured and of the person effecting the insurance. * * * The* person insured in a case under the first sentence of this subsection or the person effecting the insurance other than the wife of the insured in a case under the second sentence, and the person effecting the insurance under the third sentence thereof, or the executor or administrator of any such persons, or a person entitled to the proceeds or avails of such policy in trust for such persons shall not be deemed a third person beneficiary, assignee or payee. * * *" (Emphasis supplied.)

the phrase "effected by any person" applies only to natural persons despite § 37 of New York's General Construction Law, McKinney's Consol. Laws, c. 22, defining "person" to include a corporation, and that in any event Gibraltar could not take advantage of "the allowances to bankrupts of the exemptions which are prescribed by the laws of the United States or by the State laws in force at the time of the filing of the petition in the State wherein they have had their domicile * * *," authorized by § 6 of the Bankruptcy Act. Agreeing with the latter ruling we have no occasion to pass upon the former.

If Hygrade had not assigned the policy, no exemption could have been asserted since the second sentence of § 166, subd. 1, which would then have been the only basis for one, exempts the policy from the claims of the creditors and personal representatives of the person insured (here Wohl) rather than of creditors of its owner. Gibraltar thus cannot take advantage of the principle that an assignee of exempt property may have the benefit of the exemption accorded by § 6 since the estate otherwise available to creditors will not be diminished by the assignment. See Rutledge v. Johansen, 270 F.2d 881, 883 (10 Cir. 1959); 1 Collier, Bankruptcy ¶ 6 11 (1967). On the face of things, it would seem incongruous that a policy not exempt in the bankrupt's hands should become so when preferentially assigned to a creditor, as would be rather apparent if the policy here had possessed a substantial cash surrender value. If New York intended to accomplish any such result, as a literal reading of the third sentence of § 166, subd. 1 might suggest, it meant to do something Congress did not allow. Section 6 of the Bankruptcy Act is limited to allowances "to bankrupts" and while we have expanded this to include members of the bankrupt's immediate family who have been named as beneficiaries, see In re Messinger, 29 F.2d 158, 68 A.L.R. 1205 (2 Cir. 1928), cert. denied, Reilly v. Messinger, 279 U.S. 855, 49 S.Ct. 351, 73 L.Ed. 996 (1929);

Schwartz v. Holzman, 69 F.2d 814 (2 Cir.), cert. denied, 293 U.S. 565, 55 S. Ct. 76, 79 L.Ed. 655 (1934); In re Keil, 88 F.2d 7 (2 Cir. 1937); Schwartz v. Seldon, 153 F.2d 334, 169 A.L.R. 1375 (2 Cir. 1945), we know of no principle and have not been informed of any precedent that would justify expanding the exemption Congress allowed "to bankrupts" so as to include a policy of life insurance, not exempted by state law for the bankrupt, when this is in the hands of an unrelated person.

## II.

The referee thought that because of the new security taken by Gibraltar for advances made to Hygrade after November 26, 1962, the assignment of the insurance policy was solely "for or on account of" the then existing indebtedness of between $300,000 and $400,000 which was only partially secured. The district judge reached an opposite conclusion, "that the assignment of the policy was taken as consideration for future financing of a business all hoped would be saved." If the understanding was in fact that the policy should constitute security only for new advances, we fail to perceive how Gibraltar could be allowed to use the proceeds to secure old ones. What seems entirely plain is that the parties made no such sharp distinctions as have now been attributed to them; the insurance policy was meant to secure advances both old and new according as need might arise.

While application of the proceeds of the policy to repayment of fresh advances made in reliance thereon would not constitute a voidable preference, their application to the payment of antecedent debts would, see 3 Collier, Bankruptcy ¶ 60.19 at 855 (1967), subject only to the point concerning the amount of the transfer we will next consider. Save for that, the case is indistinguishable from the many holdings that where the fair value of security given by the debtor exceeds the new loan, there is a voidable preference—assuming the other elements exist—insofar as the security

is applied in satisfaction of an antecedent debt. See, e. g., Aulick v. Largent, 295 F.2d 41, 45 (4 Cir. 1961); United Pacific Insurance Co. v. United States, 358 F.2d 966, 175 Ct.Cl. 118 (1966); In re Schindler, 223 F.Supp. 512 (E.D.Mo.1963); MacLachlan, Bankruptcy, 292–93 (1956); 4 Remington, Bankruptcy § 1661.3 (1957).

### III.

 Gibraltar's next line of defense, sustained by the district judge, is that any transfer to it was so minuscule in amount as not to constitute a preference. It argues that there would have been no preference if it had bought the policy for $393, which indeed it could have included as a financing charge so that no money would have had to pass, and that the depletion effected by the assignment cannot have been greater than this or, at most, the $1000 required to buy a replacement policy. This concentration on the situation as of November 26 gives insufficient weight to the final portion of the definition of a preferential transfer in § 60a (1), to wit, "the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class." Palmer Clay Products Co. v. Brown, 297 U.S. 227, 229, 56 S.Ct. 450, 451, 80 L.Ed. 655 (1936), teaches that under this language "Whether a creditor has received a preference is to be determined, not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results." See 3 Collier, Bankruptcy ¶ 60.35 and ¶ 60.36. Con-

tinental & Commercial Trust & Sav. Bank v. Chicago T. & Savings Co., 229 U.S. 435, 33 S.Ct. 829, 57 L.Ed. 1268 (1913), relied upon by Gibraltar, stands only for the undoubted proposition that the challenged transfer must deplete the estate to be preferential; it nowhere indicates that depletion should be measured at the time of the transfer. Virginia National Bank v. Woodson, 329 F.2d 836 (4 Cir. 1964), also cited by Gibraltar, may be similarly distinguished.[3] Moreover, the trustee's position accords with the equities as we view them. On November 26, 1962, Gibraltar knew the continuance of Hygrade's business to be parlous at best. It knew also that everything depended on Wohl; according to Gibraltar's vice president, when Wohl sought continued advances, "we told him we would want additional insurance on his life because he was the key man in the business and without him we felt the business would not continue," as proved all too true. Gibraltar must have realized that Wohl's life was equally important to other creditors, who would have shared in the proceeds of the $100,000 policy as matters stood. Yet Gibraltar took this valuable asset for itself, knowing that no replacement would be provided. Under such circumstances it cannot be heard in equity to say it was preferred only to the extent of $393 or $1000, representing actuarial averages, when the very event it feared and to protect against which it took an assignment of the policy, to the detriment of other creditors, occurred nine days later. The case is the unusual one where "market value" affords no real indication of an asset's worth.

 There is even less merit in Gibraltar's further argument that § 60

---

**3.** While the only district court case at all in point, In re Little River Lumber Co., 92 F. 585 (W.D.Ark.1899), dealing with fire insurance policies payable to a creditor and apparently covering property not subject to a valid lien held by him, does rule in Gibraltar's favor, its reasoning, predicated upon the general validity of equitable liens in bankruptcy, is no longer acceptable, see § 60(a) (6).

On the other hand, if policies validly made payable to specified creditors are *renewed* in the four month pre-bankruptcy period pursuant to an earlier agreement, the transaction would not be preferential as the substitution of collateral rationale, developed later in this opinion, would apply. Cf. Sullivan v. Meyer, 137 Tenn. 412, 193 S.W. 124 (1917).

(b) limits the trustee's recovery to the policy's cash surrender value. The statute grants the trustee the right to recover "the property" transferred preferentially, or, if it has been "converted," its value. A policy is not "converted" within the meaning of the statute by the mere fact that it matures. See 3 Collier, Bankruptcy ¶ 60.59. The trustee emphasizes that if Wohl had died a bit later or the adjudication had occurred a bit earlier, he could have recovered the policy itself ("the property") prior to Gibraltar's collection of it. We do not understand why Wohl's early death and collection of the proceeds by the preferred creditor should bring about a different result.

### IV.

Gibraltar's claim that it is entitled under § 60c to set off against the trustee's counterclaim advances between November 26, 1962 and January 23, 1963, in the sum of $60,917, requires little discussion. That section provides:

> "If a creditor has been preferred, and afterwards in good faith gives the debtor further credit without security of any kind for property which becomes a part of the debtor's estate, the amount of such new credit remaining unpaid at the time of the adjudication in bankruptcy may be set off against the amount which would otherwise be recoverable from him."

We see no reason to doubt that Gibraltar's actions, designed to keep Hygrade afloat, were "in good faith," Kaufman v. Tredway, 195 U.S. 271, 25 S.Ct. 33, 49 L.Ed. 190 (1904); Grandison v. Nat. Bank of Commerce, 231 F. 800 (2 Cir.), cert. denied, 242 U.S. 644, 37 S.Ct. 213, 61 L.Ed. 542 (1916); 2 Collier, Bankruptcy ¶ 60.67 at 1138. But the advances were not made "without security of any kind"; to the contrary, the district judge's opinion lists security of $64,259.66 exclusive of the life insurance policy.

However, there is more to Gibraltar's argument than this. The assignment of the insurance policy was not a voidable preference insofar as Gibraltar made advances after November 26 in reliance thereon and needed to resort to the proceeds of the policy for their payment. We have already indicated that the policy was assigned to secure advances both old and new, and the record is clear that in making future advances, particularly after Wohl's death on December 5, Gibraltar relied on everything that it had. Hence, if for example the "new" security taken for the $60,917 of new advances was worth only $30,000, there could be no question under the circumstances of Gibraltar's right to use $30,917 of the insurance proceeds to satisfy its post-November 26 claims. See § 60(a) (8). The results should be the same insofar as preexisting arrangements permitted security avowedly given for post-November 26 advances to be applied to antecedent debts without constituting a voidable preference despite Gibraltar's reasonable cause to believe in Hygrade's insolvency. There is reason to think some of the "new" security fits that description.

We start with the easiest case: Included in the list of new security furnished by Hygrade are two chattel mortgages executed on November 26 and 27 in the face amount of $23,500. Examination of the schedules attached to the mortgage of November 26 indicates that in fact almost all the chattels listed had been mortgaged to Gibraltar on December 18, 1960. To that extent Gibraltar is entitled to have the value of the mortgaged chattels applied to antecedent debts and look to the insurance proceeds, if need be, for payment of later advances.[4]

The other "new" security stated to have been obtained by Gibraltar consisted of $41,759.66 in accounts receivable. The factoring agreement of February 8, 1960, which was duly filed, gave Gibraltar a lien both upon existing and future in-

---

4. The mortgage of November 27 is not part of the record on this appeal. It should, of course, be treated in the same way.

ventory and upon "all the accounts receivable and other proceeds resulting from the sale or other disposition of such merchandise." So far as the accounts receivable are concerned, this agreement gave Gibraltar no more than an equitable lien upon the future accounts as they arose, which would have been inferior to the lien of an attaching judgment creditor. See Okin v. Isaac Goldman Co., 79 F.2d 317 (2 Cir. 1935); Rockmore v. Lehman, 128 F.2d 564 (2 Cir. 1942), rev'd on rehearing, 129 F.2d 892, cert. denied 317 U.S. 700, 63 S.Ct. 525, 87 L.Ed. 559 (1943); Matter of City of New York v. Bedford Bar & Grill, 2 N.Y.2d 429, 161 N.Y.S.2d 67, 141 N.E.2d 575 (1957). It was only when the factor satisfied the further requirement imposed by § 45 of the New York Personal Property Law, McKinney's Consol.Laws, c. 41, then in effect, and either notified the account debtor "that the account is payable to the lienor," or secured an additional assignment, that the lien became "so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee * * *," see § 60(a)(2). Since the transfer of the $41,759.66 in accounts was "perfected" within the four months period and after Gibraltar had reasonable cause to believe Hygrade was insolvent, it is preferential if applied to antecedent debts. To allow the factor's lien to attach to inventory coming into Hygrade's possession after November 26 as security for such debts would be similarly preferential. Zartman v. First Nat'l Bank, 189 N.Y. 267, 82 N.E. 127, 12 L.R. A.,N.S., 1083 (1907); Irving Trust Co. v. Commercial Factors Corp., 68 F.2d 864, 868–869 (2 Cir. 1934).

■ The factor's lien would therefore assist Gibraltar only so far as a substitution of collateral theory might apply, see 3 Collier, Bankruptcy ¶ 60.21 and cases cited. If, for example, $10,000 in pre-November 26 inventory were sold on December 10, Gibraltar clearly would have right to substitute as security for an antecedent debt new accounts receivable or inventory to which its lien attached between November 26 and December 10. In re Pusey, Maynes, Breish Co., 122 F.2d 606, 608 (3 Cir. 1941) (Goodrich, J.). There would be more of a problem if Gibraltar should seek to "substitute" for inventory that was thus sold the account receivable resulting from its sale. The problem would be that, on our reading of § 45, Gibraltar's lien on this account would be perfected only when it secured an additional assignment or notified the account debtor—and this could occur only after December 10. Under old cases the new security could not be properly "substituted" for the old on the ground that replacement was not "contemporaneous." In re Lambert & Braceland Co., 29 F.2d 758 (E.D.Pa.1928); In re Baumgartner, 55 F.2d 1041, (7 Cir. 1931). However, it has been persuasively argued by commentators on the "floating lien" provisions of the Uniform Commercial Code, Note, After Acquired Property Security Interests in Bankruptcy: A Substitution of Collateral Defense of the U.C.C., 77 Yale L.J. 139, 151–58 (1967); 1 Coogan, Hogan & Vagts, Secured Transactions Under the Uniform Commercial Code, 1084–85 (1966); 2 Gilmore, Security Interests in Personal Property 1315–16 (1965), that this requirement was based upon the principle of Benedict v. Ratner, 268 U.S. 353, 45 S.Ct. 566, 69 L.Ed. 991 (1925), which, as the author of that opinion recognized, does not apply to liens authorized by New York's Factor's Act. Id. at 361 n. 11; In re Cut Rate Furniture Co., 163 F.Supp. 360 (N.D.N.Y.1958); Colbath v. Mechanics National Bank, 96 N.H. 110, 70 A.2d 608 (1950) (construing New Hampshire's Factor's Act derived from the New York statute); 1 Gilmore, supra, § 8.8 (1965); but see Zinman, Dominion and the Factor's Lien, 30 Ford.L.Rev. 50 (1961). Since Gibraltar, by policing its collateral strictly, could have perfected its lien on the accounts receivable as soon as the merchandise had been sold, it may substitute post-November 26 accounts receivable as security for antecedent debts to the extent that its inventory lien had

been depleted by subsequent sales. The record, however, does not permit us to determine whether pre-November 26 inventory was in fact sold, and, if so, in what amount.

We hold that Gibraltar may retain so much, if any, of the proceeds of the policy on Wohl's life as is required to pay its post-November 26 loans to Hygrade after applying to them all post-November 26 security except (1) the value of property covered by the chattel mortgages of November 26 and 27 which in fact was already validly mortgaged to it, and (2) post-November 26 accounts receivable and inventory, if any, which merely replaced similar security held on that date. The balance of the proceeds is payable to the trustee. The judgment disallowing the trustee's counterclaim is therefore reversed and the cause remanded to the district court with instructions to remand to the referee for further proceedings consistent with this opinion. Each party shall pay its own costs on appeal.